IN THE UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF TEXAS
DALLAS DIVISION

| | | |
|---|---|---|
| KENDRICK THURMAN RANDLE, | § | |
| | § | |
| Plaintiff, | § | |
| | § | |
| V. | § | No. 3:23-cv-2532-E-BN |
| | § | |
| MARIAN BROWN, ET AL., | § | |
| | § | |
| Defendants. | § | |

**FINDINGS, CONCLUSIONS, AND RECOMMENDATION OF THE
UNITED STATES MAGISTRATE JUDGE**

Plaintiff Kendrick Thurman Randle, represented by counsel, filed a complaint alleging violations of Title II of the Americans with Disabilities Act ("Title II" or the "ADA"), Section 504 of the Rehabilitation Act ("Section 504" or the "RA"), the Due Process Clause of the Fourteenth Amendment to the United States Constitution, and Texas law. *See* Dkt. No. 1.

Randle also moved for leave to proceed *in forma pauperis* ("IFP"). *See* Dkt. No. 3. So United States District Judge Ada Brown referred this case to the undersigned United States magistrate judge for screening under 28 U.S.C. § 636(b) and a standing order of reference.

The Court granted Randle leave to proceed IFP, *see* Dkt. No. 4, subjecting his claims to screening under 28 U.S.C. § 1915(e)(2).

And the undersigned enters these findings of fact, conclusions of law, and recommendation that, considering the substantial deficiencies set out below, the Court should order Randle to file an amended complaint or risk the dismissal with

prejudice of significant parts of this lawsuit.

## Applicable Background

The undersigned draws the background of this lawsuit from the introduction

paragraphs of the complaint:

> On September 30, 2021, Grand Prairie Police arrested Mr. Randle for evading arrest after he failed to pull over for not wearing a seatbelt. Mr. Randle – then 41 years old – had no history of mental illness and has suffered from a severe stutter since childhood. On November 30, 2021, Dr. Michael Pittman negligently misdiagnosed Mr. Randle with a "psychiatric disorder not otherwise specified." After a cursory interview Dr. Pittman found him incompetent to stand trial.
>
> On the same day as Mr. Randle's psychiatric interview, the City of Grand Prairie sold Mr. Randle's car, which was also his home, without notice. He lost irreplaceable family photos, records, and property. The Public Defender assigned to Mr. Randle, attorney Malcom Harden, waived Mr. Randle's presence at the competency hearing and abandoned his duty of zealous representation. Due to Mr. Randle's disability, he was unnecessarily institutionalized and deprived of his property without due process of law. He was not released from Dallas County Jail until March 15, 2023, over a year after his arrest. On March 30, 2023, the felony evading arrest charge was dismissed.

Dkt. No. 1 at 1-2.

## Legal Standards

Section 1915(e)(2) authorizes the Court to dismiss a complaint filed IFP (or any

portion of that complaint) if it fails to state a claim on which relief may be granted.

*See* 28 U.S.C. § 1915(e)(2)(B)(ii). "The language of § 1915(e)(2)(B)(ii) tracks the

language of Federal Rule of Civil Procedure 12(b)(6)." *Black v. Warren*, 134 F.3d 732,

733-34 (5th Cir. 1998) (per curiam). Accordingly, the pleading requirements set out

in *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544 (2007), and *Ashcroft v. Iqbal*, 556 U.S.

662 (2009), apply to the Court's screening of a complaint filed IFP.

Considering these standards, Federal Rule of Civil Procedure 8(a)(2) does not

require that a complaint contain detailed factual allegations – just "enough facts to state a claim to relief that is plausible on its face." *Twombly*, 550 U.S. at 570.

"The plausibility standard is not akin to a 'probability requirement,' but it asks for more than a sheer possibility that a defendant has acted unlawfully." *Iqbal*, 556 U.S. at 678. So, "[w]here a complaint pleads facts that are merely consistent with a defendant's liability, it stops short of the line between possibility and plausibility of entitlement to relief." *Id.* (cleaned up; quoting *Twombly*, 550 U.S. at 557).

On the other hand, "[a] claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Id.*;

"The burden is on the plaintiff to frame a 'complaint with enough factual matter (taken as true) to suggest' that he or she is entitled to relief." *Robbins v. Oklahoma*, 519 F.3d 1242, 1248 (10th Cir. 2008) (quoting *Twombly*, 550 U.S. at 556).

But, while a court must accept a plaintiff's allegations as true, it is "not bound to accept as true a legal conclusion couched as a factual allegation." *Iqbal*, 556 U.S. at 678 (quoting *Twombly*, 550 U.S. at 555).

In fact, "the court does not 'presume true a number of categories of statements, including,'" in addition to legal conclusions, "'mere labels; threadbare recitals of the elements of a cause of action; conclusory statements; and naked assertions devoid of further factual enhancement.'" *Armstrong v. Ashley*, 60 F.4th 262, 269 (5th Cir. 2023) (quoting *Harmon v. City of Arlington, Tex.*, 16 F.4th 1159, 1162-63 (5th Cir. 2021)); *see also Heinze v. Tesco Corp.*, 971 F.3d 475, 479 (5th Cir. 2020) (Courts "do not accept

as true conclusory allegations, unwarranted factual inferences, or legal conclusions." (cleaned up)).

So, to avoid dismissal under Section 1915(e)(2)(B)(ii), plaintiffs must "plead facts sufficient to show" that the claims asserted have "substantive plausibility" by stating "simply, concisely, and directly events" that they contend entitle them to relief. *Johnson v. City of Shelby, Miss.*, 574 U.S. 10, 12 (2014) (per curiam) (citing FED. R. CIV. P. 8(a)(2)-(3), (d)(1), (e)); *see also Inclusive Communities Project, Inc. v. Lincoln Prop. Co.*, 920 F.3d 890, 899 (5th Cir. 2019) ("'Determining whether a complaint states a plausible claim for relief' is 'a context-specific task that requires the reviewing court to draw on its judicial experience and common sense.'" (quoting *Iqbal*, 556 U.S. at 679)).

## Analysis

To start, the structure of Randle's complaint causes confusion.

After setting out the parties and the facts, *see* Dkt. No. 1, ¶¶ 1-32, Randle alleges that those paragraphs support violations of Title II and Section 504, *see id.*, ¶¶ 33-35. Randle then "repeats and re-alleges each allegation contained in paragraphs 1-36" to support the federal due process claim brought under 42 U.S.C. § 1983. *Id.*, ¶ 37. The pattern continues as to the state law claims: as to each, Randle "incorporates by reference all preceding paragraphs and realleges them in support of" that claim. *Id.*, ¶¶ 40, 43, 50, 53, & 55.

Pleading in this manner is the "oppo[site of] the 'short and plain statement' requirement contemplated by Rule 8." *Roe v. Johnson Cnty., Tex.*, No. 3:18-cv-2497-

B-BN, 2019 WL 5031357, at *5 (N.D. Tex. July 29, 2019) (citations omitted), *rec. accepted*, 2019 WL 3980737 (N.D. Tex. Aug. 22, 2019).

Doing so makes it "virtually impossible to know which allegations of fact are intended to support which claim(s) for relief." *Anderson v. Dist. Bd. of Trs. of Cent. Fla. Cmty. Coll.*, 77 F.3d 364, 366 (11th Cir. 1996).

Consequently, "[a] dismissal under Rules 8(a)(2) and 10(b) is appropriate." *Weiland v. Palm Beach Cnty. Sheriff's Office*, 792 F.3d 1313, 1320-23 (11th Cir. 2015) (citing *Anderson*, 77 F.3d at 366); *see also Roe*, 2019 WL 5031357, at *5 ("Shotgun pleadings are subject to dismissal under Rule 12(b)(6), particularly where – as shown by the multiplicity of claims here – 'the pleader heedlessly throws a little bit of everything into his complaint in the hopes that something will stick.'" (quoting *S. Leasing Partners, Ltd. v. McMullan*, 801 F.2d 783, 788 (5th Cir. 1986))).

Turning to the named defendants, Randle has sued the City of Grand Prairie, Texas and Dallas County, Texas, both municipalities, and four individuals: Dallas County Sheriff Marian Brown; two Dallas County public defenders (the Chief Public Defender and the assistant public defender who represented him); and the psychiatrist who evaluated him for competency to stand trial, all in their official and individual capacities. *See* Dkt. No. 1, ¶¶ 2-7, & 10.

Without supporting facts, Randle next "alleges that the Defendants were responsible for the events and happenings set forth herein and proximately caused injury and damages to [him] as herein alleged and are jointly and severally responsible for [his] damages." *Id.*, ¶ 8.

Randle similarly alleges that "[e]ach Defendant was acting within the course and scope of his, her, or its authority as an agent, servant, or employee of the other Dallas County Defendants. The Dallas County Defendants and each of them, are individuals, corporations, partnerships, and other entities which engaged in, joined in, and conspired with the other wrongdoers in carrying out the tortious and unlawful activities described in this complaint, and Dallas County Defendants, and each of them, ratified the acts of the other Dallas County Defendants as described in this Complaint." *Id.*, ¶ 9.

So Randle essentially alleges that each defendant is responsible for all claims made in the complaint. But such a sweeping contention is not supported by the facts. For example, the City of Grand Prairie allegedly towed his car. But no facts provided support that the City then refused to accommodate Randle's alleged disability while he was detained prior to trial.

Nor does Randle allege facts to support a conspiracy. *Cf. Terwilliger v. Reyna*, 4 F.4th 270, 285 (5th Cir. 2021) ("Absent from the complaint is any sufficiently pled agreement to violate [Randle's] constitutional rights[:] 'A conclusory allegation of agreement at some unidentified point does not supply facts adequate to show illegality.'" (quoting *Twombly*, 550 U.S. at 557)).

And, while the allegations above appear to reflect Randle's belief that he has sued municipalities and their employees – as opposed to, as to the individual defendants, State employees – such conclusory assertions do not advance the requirement that Randle provide enough factual content to allow the Court to

reasonable infer that each named defendant is liable for each alleged misconduct.

The same holds true as to how the individual causes of action are alleged.

But the undersigned will focus on the alleged violations of the ADA, the RA, and Section 1983. Because, as Randle recognizes, *see* Dkt. No. 1, ¶ 12, these claims provide for federal question jurisdiction under 28 U.S.C. § 1331, the "independent basis of subject matter jurisdiction" that allows for supplemental jurisdiction under 28 U.S.C. § 1367 for the remaining counts, *Atkins v. Propst*, No. 22-10609, 2023 WL 2658852, at *2 (5th Cir. Mar. 28, 2023) (per curiam) (citing *Arena v. Graybar Elec. Co., Inc.*, 669 F.3d 214 (5th Cir. 2012)).

So, if Randle has not plausibly alleged (and ultimately cannot allege) a violation of Title II, or of the RA, or of Section 1983, such that these claims should all be dismissed with prejudice, most likely the Court would elect to relinquish jurisdiction over the remaining claims at this early stage of the proceeding. *See, e.g.*, *Enochs v. Lampasas Cnty.*, 641 F.3d 155, 158-59 (5th Cir. 2011).

## I.    Title II and Section 504

"The ADA is a broad mandate of comprehensive character and sweeping purpose intended to eliminate discrimination against disabled individuals and to integrate them into the economic and social mainstream of American life." *Clark v. Dep't of Pub. Safety*, 63 F.4th 466, 470 (5th Cir. 2023) (per curiam) (quoting *Frame v. City of Arlington*, 657 F.3d 215, 223 (5th Cir. 2011)); *see, e.g.*, *Luke v. Texas*, 46 F.4th 301, 304 (5th Cir. 2022) ("The question is whether denying a deaf defendant an interpreter during his criminal proceedings violates the Americans with Disabilities

- 7 -

Act. The answer is yes.").

> The focus of Title II of the ADA is the provision of public services. Title
> II provides that "no qualified individual with a disability shall, by reason
> of such disability, be excluded from participation in or be denied the
> benefits of the services, programs, or activities of a public entity, or be
> subjected to discrimination by any such entity." 42 U.S.C. § 12132.
> Likewise, Section 504 of the Rehabilitation Act prohibits disability
> discrimination by recipients of federal funding. Section 504 provides
> that no qualified individual with a disability "shall, solely by reason of
> her or his disability, be excluded from the participation in, be denied the
> benefits of, or be subjected to discrimination under any program or
> activity receiving Federal financial assistance." 29 U.S.C. § 794(a).

*Clark*, 63 F.4th at 470.

Where claims are made under both Title II and Section 504, courts typically
"focus on Title II," applying that analysis to the Section 504 claim, since the ADA and
the RA "'generally are interpreted in *pari materia*.'" *Id.* (quoting *Frame*, 657 F.3d at
223); *see also Pace v. Bogalusa City Sch. Bd.*, 403 F.3d 272, 287-88 & n.76 (5th Cir.
2005) (en banc) ("This circuit, as well as others, has noted that, because the rights
and remedies under both statutes are the same, case law interpreting one statute can
be applied to the other." (citations omitted)).

To plausibly allege a Title II violation, Randle must provide factual content to
show – or from which the Court may infer –

> "(1) that he is a qualified individual within the meaning of the ADA; (2)
> that he is being excluded from participation in, or being denied benefits
> of, services, programs, or activities for which the public entity is
> responsible, or is otherwise being discriminated against by the public
> entity; and (3) that such exclusion, denial of benefits, or discrimination
> is by reason of his disability."

*Windham v. Harris Cnty., Tex.*, 875 F.3d 229, 235 (5th Cir. 2017) (quoting *Melton v.
Dall. Area Rapid Transit*, 391 F.3d 669, 671-72 (5th Cir. 2004)).

As to the first element of an ADA discrimination claim,

[t]he ADA defines "disability" as, with respect to an individual, "a physical or mental impairment that substantially limits one or more major life activities of such individual." 42 U.S.C. § 12102(1)(A). "Merely having an impairment" is not enough to qualify as disabled under the ADA – a plaintiff "also need[s] to demonstrate that the impairment substantially limits a major life activity." *E.E.O.C. v. Chevron Phillips Chem. Co.*, 570 F.3d 606, 614 (5th Cir. 2009). The ADA defines a "major life activity" as including "caring for oneself, performing manual tasks, seeing, hearing, eating, sleeping, walking, standing, lifting, bending, speaking, breathing, learning, reading, concentrating, thinking, communicating, and working," 42 U.S.C. § 12102(2)(A), as well as "the operation of a major bodily function, including ... neurological [and] brain ... functions," *id.* § 12102(2)(B).

*Mueck v. La Grange Acquisitions, L.P.*, 75 F.4th 469, 478-79 (5th Cir. 2023); *see also id.* at 480-81 (further noting that "an impairment need not be 'permanent or long-term' to qualify as a disability" under the ADA).

Randle's alleging that his stuttering is so severe that he prefers to communicate in writing, *see* Dkt. No. 1, ¶¶ 16, 17, & 25-31, meets the first element for the purpose of judicial screening where "the inquiry as to whether a limitation is substantial requires assessing 'whether the plaintiff's impairment substantially limits his ability to perform a major life activity as compared to most people in the general population'" and "[d]etermining whether a plaintiff has a disability therefore requires an individualized assessment of the impact of the impairment on an individual's major life activities," *Mueck*, 75 F.4th at 479 (cleaned up); *see, e.g., Medvic v. Compass Sign Co., LLC*, Civ. A. No. 10-5222, 2011 WL 3513499, at *5 (E.D. Pa. Aug. 10, 2011) (where "Plaintiff assert[ed] that his stuttering substantially limits his major life activity of communication," "[t]he Court agree[d] that stuttering is an 'impairment' under the ADA" (collecting cases)).

As to the second element, "[r]easonable accommodations are generally designed to avoid effects that stem directly from one's disability." *Clark*, 63 F.4th at 472.

And Randle alleges that, all but once, his stuttering was accommodated through the provision of pens and paper to communicate. *See* Dkt. No. 1, ¶¶ 17, 18, & 27; *see also id.*, ¶ 25 (alleging that, when he "requested pens and paper to communicate with jail administration and other inmates, he was ignored" and that, because "Dallas County Jail failed to provide any type of accommodation for his disability[, h]e was forced to purchase supplies with his meager commissary funds").

And, as alleged, the jail's failing to provide Randle free pens and paper as an accommodation may satisfy the second and third element for present purposes – as to two, but not all, of the defendants named. *See Luke*, 46 F.4th at 305 ("Luke can show that he was discriminated against because of his disability as both Lee County and the Supervision Departments knew he was deaf yet failed to provide an accommodation despite multiple requests for an interpreter." (citing *Windham*, 875 F.3d at 235)).

But Randle has not alleged enough factual content to assert a plausible claim "that he was denied the benefit of 'meaningful access' to public services" based on his overall experience in the state criminal justice system – from arrest to the dismissal of charges. *Id.* at 305-06 (citations and footnote omitted).

That is, Randle has not alleged (1) facts from which the Court may infer that his stuttering caused him to not understand any element of the criminal proceeding

- 10 -

or (2) facts to connect a failure to accommodate his stuttering to, for example, the alleged malpractice of either his defense counsel or the psychiatrist whose alleged misdiagnosis as to competency prolonged Randle's detention. *See* Dkt. No. 1, ¶¶ 16-31. *Cf. Luke*, 46 F.4th at 306 ("Not being able to understand a court hearing or meeting with a probation officer is, by definition, a lack of meaningful access to those public services. Indeed, a core purpose of Title II is for public entities to 'accommodate persons with disabilities in the administration of justice.' ... Nothing in the statute's text or the caselaw applying it requires Luke to have alleged a bad outcome – something like being wrongly arrested, getting his bail or probation revoked, or mistakenly entering a guilty plea because of confusion without an interpreter. And for good reason: Lack of meaningful access is itself the harm under Title II, regardless of whether any additional injury follows. Luke's Title II injury is not being able to understand the judges and probation officers as a nondeaf defendant would." (citations omitted)).

In sum, as currently pled, the undersigned would recommend that the Court allow to proceed Randle's Title II and Section 504 claims only as to the jail, so that these claims should be served only as to Dallas County and Sheriff Brown. *Cf. Delano-Pyle v. Victoria Cnty., Tex.*, 302 F.3d 567, 574-75 (5th Cir. 2002) ("conclud[ing] that neither a policymaker, nor an official policy must be identified for claims asserted under the ADA or the RA").

## II.    Section 1983

"A plaintiff makes out a § 1983 claim if he 'shows a violation of the Constitution

or of federal law, and then shows that the violation was committed by someone acting under color of state law.'" *Rich v. Palko*, 920 F.3d 288, 293-94 (5th Cir. 2019) (cleaned up; quoting *Brown v. Miller*, 519 F.3d 231, 236 (5th Cir. 2008)).

As to the defendants named in the complaint, as explained above, two are municipalities and four are individuals, sued in both their official and individual capacities. So the undersigned will address the Section 1983 claim in three parts.

First, "[a] person may sue a municipality that violates his or her constitutional rights [only] 'under color of any statute, ordinance, regulation, custom, or usage.'" *Hutcheson v. Dall. Cnty., Tex.*, 994 F.3d 477, 482 (5th Cir. 2021) (quoting Section 1983; citing *Monell v. Dep't of Soc. Servs.*, 436 U.S. 658, 690 (1978)).

So a plaintiff alleging a *Monell* claim "has two burdens: to [plausibly allege] (1) that a constitutional violation occurred and (2) that a municipal policy was the moving force behind the violation," *Sanchez v. Young Cnty., Tex.*, 956 F.3d 785, 791 (5th Cir. 2020) (citing *Monell*, 436 U.S. at 694).

Accordingly, "[i]n municipal-liability cases," the threshold question "is whether the complained-of 'act may fairly be said to represent official policy.'" *Id.* at 792-93 (cleaned up; quoting *Monell*, 436 U.S. at 694); *see also Hutcheson*, 994 F.3d at 483 (rejecting the argument that a district court errs by dismissing a *Monell* claim without first analyzing the underlying constitutional violation).

And a plaintiff may proceed on a *Monell* claim only by

> identify[ing] "(1) an official policy (or custom), of which (2) a policy maker can be charged with actual or constructive knowledge, and (3) a constitutional violation whose moving force is that policy (or custom)." *Pineda v. City of Hous.*, 291 F.3d 325, 328 (5th Cir. 2002) (cleaned up).

> Municipalities are not liable "on the theory of respondeat superior" and are "almost never liable for an isolated unconstitutional act on the part of an employee." *Peterson v. City of Fort Worth*, 588 F.3d 838, 847 (5th Cir. 2009).

*Hutcheson*, 994 F.3d at 482; *see also Brown v. Tarrant Cnty., Tex.*, 985 F.3d 489, 497 & n.11 (5th Cir. 2021) (noting that where a plaintiff's claim fails as to one prong, a court "need not consider whether [his] claim also fails the other two *Monell* prongs" (citing *Zarnow v. City of Wichita Falls*, 614 F.3d 161, 168-69 (5th Cir. 2010))).

"Official policy can arise in various forms. It usually exists in the form of written policy statements, ordinances, or regulations, but may also arise in the form of a widespread practice that is 'so common and well-settled as to constitute a custom that fairly represents municipal policy.'" *James v. Harris Cnty.*, 577 F.3d 612, 617 (5th Cir. 2009) (quoting *Piotrowski v. City of Hous.*, 237 F.3d 567, 579 (5th Cir. 2001) (quoting, in turn, *Webster v. City of Hous.*, 735 F.2d 838, 841 (5th Cir. 1984) (per curiam) (en banc))); *see also Brown*, 985 F.3d at 497 ("An 'official policy' may take two forms – either a 'policy statement formally announced by an official policymaker' or a 'persistent widespread practice of city officials or employees, which, although not authorized by officially adopted and promulgated policy, is so common and well settled as to constitute a custom that fairly represents municipal policy.'" (quoting *Zarnow*, 614 F.3d at 168-69)).

"Under the second requirement, a plaintiff must show '[a]ctual or constructive knowledge of [a] custom' that is 'attributable to the governing body of the municipality or to an official to whom that body ha[s] delegated policy-making authority.'" *Allen v. Hays*, 65 F.4th 736, 749 (5th Cir. 2023) (quoting *Webster*, 735

F.2d at 841). And "a plaintiff must allege 'moving force' causation by showing first, 'that the municipal action was taken with the requisite degree of culpability and must demonstrate a direct causal link between the municipal action and the deprivation of federal rights.'" *Id.* (quoting *Valle v. City of Hous.*, 613 F.3d 536, 542 (5th Cir. 2010)).

"[T]he failure to provide proper training may fairly be said to represent a policy for which the [municipality] is responsible, and for which [it] may be held liable if it actually causes injury." *Shumpert v. City of Tupelo*, 905 F.3d 310, 317 (5th Cir. 2019) (quoting *City of Canton v. Harris*, 489 U.S. 378, 390 (1989)). And, although an alleged failure to train (or to supervise) "is a separate theory of municipal liability," "the same standard applies both to a failure to train [or to supervise] claim and to a municipal liability claim." *Pinedo v. City of Dall., Tex.*, No. 3:14-cv-958-D, 2015 WL 5021393, at *9 (N.D. Tex. Aug. 25, 2015) (citations omitted).

"The ratification theory provides another way of holding a city liable under § 1983" but only "if the policymaker approves a subordinate's decision and the basis for it, as this 'ratification' renders the subordinate's decision a final decision by the policymaker." *Allen*, 65 F.4th at 749 (footnote omitted). But "a policymaker who defends conduct that is later shown to be unlawful does not necessarily incur liability on behalf of the municipality." *Peterson*, 588 F.3d at 849 (citation omitted).

This theory is also "limited to 'extreme factual situations,'" such that conduct may be unconstitutional but "not sufficiently extreme to qualify for a finding of ratification." *Davidson v. City of Stafford, Tex.*, 848 F.3d 384, 395-96 (5th Cir. 2017) (citations omitted)).

Most importantly, regardless the theory of municipal liability, "[t]o proceed beyond the pleading stage, a complaint's 'description of a policy or custom and its relationship to the underlying constitutional violation ... cannot be conclusory; it must contain specific facts.'" *Peña v. City of Rio Grande City*, 879 F.3d 613, 622 (5th Cir. 2018) (quoting *Spiller v. City of Tex. City, Police Dep't*, 130 F.3d 162, 167 (5th Cir. 1997); footnote omitted).

As to the City of Grand Prairie and Dallas County, Randle fails to provide facts that identify a policymaker or an official policy – at all.

Plus, almost without exception, allegations "limited to the events surrounding the plaintiff" himself cannot constitute "an allegation of a *de facto* policy." *Culbertson v. Lykos*, 790 F.3d 608, 629 (5th Cir. 2015); *see, e.g.*, *id.* at 628 ("Here, the plaintiffs allege there was a retaliatory campaign against them and a retaliatory investigation against the grand jury and its prosecutors, all arising from the same predicate events. The retaliatory campaign against them was publicly known, but they offered no evidence that similar retaliation had victimized others. There was, in other words, no allegation of a 'widespread practice' of retaliation that is 'so common and well settled' as to constitute the policy of Harris County." (quoting *Webster*, 735 F.2d at 853)).

So Randle has not plausibly alleged that either the City of Grand Prairie or Dallas County violated his constitutional rights.

Second, as to the official capacity claims, "the § 1983 action against [a municipal employee in an] official capacity is, in effect, a claim against [the municipality]." *Palo ex rel. Estate of Palo v. Dall. Cnty.*, No. 3:05-cv-0527-D, 2006 WL

3702655, at *1 n.3 (N.D. Tex. Dec. 15, 2006) (citing *Kentucky v. Graham*, 473 U.S. 159, 165-66 (1985)).

This would seem to dispose of all official capacity claims made. But an official capacity claim made against one's former public defender merits further discussion.

As the United States Court of Appeals for the Fifth Circuit held more than 25 years ago, "[a] municipality or county can be held accountable to a pretrial detainee for a due process violation resulting from an employee's acts only if the harmful acts resulted from a policy or custom 'adopted or maintained with objective deliberate indifference to the detainee's constitutional rights.'" *Grabowski v. Jackson Cnty. Pub. Defenders Office*, 79 F.3d 478, 479 (5th Cir. 1996) (en banc).

The same would be true as to official capacity claims against a municipal employee. And this holding may apply to both Randle's public defender and – if he may be considered a municipal employee – the psychiatrist who evaluated Randle's competency.

> But the United States Supreme Court
>
> has clearly held that public defenders are not official state actors when they "perform a lawyer's traditional functions as counsel to a defendant in a criminal proceeding." *Polk County v. Dodson*, 454 U.S. 312, 325 (1981). When a public defender "is doing a defense lawyer's primary job," he does "not act on behalf of the State; he is the State's adversary." *Brentwood Academy v. Tenn. Secondary Sch. Athletic Ass'n*, 531 U.S. 288, 303 (2001). Consequently, "the state-action doctrine does not convert opponents into virtual agents." *Id.* at 304. The rationales of these cases support finding no basis for an official capacity suit against a public defender.

*Toliver v. Thomas*, No. 3:08-cv-682-N, 2008 WL 3413140, at *4 n.5 (N.D. Tex. Aug. 11, 2008) (cleaned up; further noting that, "[e]ven if an official capacity suit can be

maintained against a public defender in Texas, such suit would necessarily fail in this instance whether the appointed attorneys are considered as county or state agents. As mentioned with respect to Plaintiff's claims against the prosecutor, an official capacity claim against a county official fails because Plaintiff has alleged no official policy or custom on the part of Dallas County that violated his constitutional rights. If the attorneys are considered state agents, they are protected against official capacity claims by Eleventh Amendment immunity." (citation omitted)).

Third, the individual capacity claims are also not plausible.

Randle has not alleged facts from which the Court may infer that his public defender was a state actor. *See id.* at *4 ("In general, defense attorneys are not state actors for purposes of § 1983." (citing *Dodson*, 454 U.S. at 325; *Hudson v. Hughes*, 98 F.3d 868, 873 (5th Cir. 1996); *Mills v. Crim. Dist. Ct. No. 3*, 837 F.2d 677, 679 (5th Cir. 1988))).

Nor has Randle alleged that the evaluating psychiatrist was a state actor. *See, e.g.*, *Jeantry v. TXFM, Inc.*, No. 4:19-CV-00366-ALM-CAN, 2020 WL 10045981, at *4 (E.D. Tex. Aug. 14, 2020) ("[C]ourts both inside and outside this circuit have roundly rejected the contention that a psychiatrist (or other private mental health or medical professional) – appointed by a state court for determination of a criminal defendant's competency to stand trial – is acting under color of state law." (collecting cases)), *rec. adopted*, 2020 WL 5790436 (E.D. Tex. Sept. 28, 2020).

And, as to the individual capacity claims against Sheriff Brown and Chief Public Defender Lynn Pride Richardson, Randle alleges no conduct by either defender

herself. And neither may be "held liable under § 1983 based on a theory of respondeat superior." *Diggs v. Waybourn*, No. 21-10395, 2022 WL 1421827, at *1 (5th Cir. May 5, 2022) (per curiam) (citing *Estate of Davis ex rel. McCully v. City of N. Richland Hills*, 406 F.3d 375, 381 (5th Cir. 2005)).

In sum, as currently pled, the undersigned would recommend that the Court dismiss the Section 1983 claims.

## Recommendation

The Court should order Plaintiff Kendrick Thurman Randle to file an amended complaint within a reasonable time to be set by the Court or risk the dismissal with prejudice of significant parts of this lawsuit.

A copy of these findings, conclusions, and recommendation shall be served on all parties in the manner provided by law. Any party who objects to any part of these findings, conclusions, and recommendation must file specific written objections within 14 days after being served with a copy. *See* 28 U.S.C. § 636(b)(1); FED. R. CIV. P. 72(b). In order to be specific, an objection must identify the specific finding or recommendation to which objection is made, state the basis for the objection, and specify the place in the magistrate judge's findings, conclusions, and recommendation where the disputed determination is found. An objection that merely incorporates by reference or refers to the briefing before the magistrate judge is not specific. Failure to file specific written objections will bar the aggrieved party from appealing the factual findings and legal conclusions of the magistrate judge that are accepted or adopted by the district court, except upon grounds of plain error. *See Douglass v.*

*United Servs. Auto. Ass'n*, 79 F.3d 1415, 1417 (5th Cir. 1996).

      DATED: November 17, 2023

 

 

_____
DAVID L. HORAN
UNITED STATES MAGISTRATE JUDGE